UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PETER OSTEN,<br><br>            Plaintiff,<br><br>    v.<br><br>THE SHAW GROUP, INC., JAMES M. BERNHARD JR., THOMAS E. CAPPS, MICHAEL J. MANCUSO, ALBERT D. MCALISTER, DAVID WILLIAMS HOYLE SR., JAMES F. BARKER, DANIEL A. HOFFLER , STEPHEN R. TRITCH, CHICAGO BRIDGE & IRON COMPANY N.V. and CRYSTAL ACQUISITION SUBSIDIARY INC.,<br><br>            Defendants. | Civil Action Case No.<br><br>**PLAINTIFF'S SHAREHOLDER COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiff Peter Osten ("Plaintiff"), by his attorneys, for his complaint against defendants, alleges upon personal knowledge as to himself, and upon information and belief as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this action individually against The Shaw Group Inc. ("Shaw" or the "Company") and its Board of Directors (the "Board" or "Individual Defendants") to enjoin a proposed transaction announced on July 30, 2012 (the "Proposed Transaction"), pursuant to which Shaw will be merged with and into Crystal Acquisition Subsidiary Inc. ("Crystal"), a

wholly-owned subsidiary of Chicago Bridge & Iron Company N.V. ("CB&I"). On or about July 30, 2012, the Individual Defendants caused Shaw to enter into an agreement and plan of merger (the "Merger Agreement") to be acquired by CB&I in a cash-and-stock merger. Pursuant to the Merger Agreement, Shaw shareholders will receive $41.00 in cash and $5.00 in CB&I equity (0.12883 shares based on an agreed upon recent average stock price of $38.81 per share) for each share of Shaw's common stock they own. The Proposed Transaction values the proposed consideration at approximately $46.00 a share. According to the press release from Shaw announcing the Proposed Transaction, the Proposed Transaction is anticipated to be completed during the first calendar quarter of 2013.

2. The Proposed Transaction is the product of a flawed process that resulted in the Board's failure to maximize shareholder value, which will deprive Shaw's public shareholders of the ability to participate in the Company's long-term prospects. Plaintiff seeks to enjoin the Proposed Transaction or, alternatively, to rescind the Proposed Transaction in the event Defendants are able to consummate it.

3. The Proposed Transaction is going to be effected through the dissemination of a materially false and misleading registration statement, as demonstrated by the preliminary Form S-4 Registration Statement filed by CB&I with the Securities and Exchange Commission ("SEC") on September 18, 2012 (the "Registration Statement") in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"). It fails to provide Company shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision on whether or not to approve the Proposed Transaction. The Proposed Transaction is unfair both with

respect to price and process and is designed to benefit Shaw's insiders to the detriment of Plaintiff.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act for violations of Sections 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

5. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because one or more of the defendants, including Shaw, either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, occurred in substantial part in this District. Finally, the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

6. Plaintiff is, and has been, a shareholder of Shaw common stock continuously since prior to the wrongs complained of herein.

7. Defendant Shaw is a Louisiana corporation that maintains its corporate headquarters at 4171 Essen Lane, Baton Rouge, LA 70809. The Company provides technology, engineering, procurement, construction, maintenance, fabrication, manufacture, consulting, remediation, and facilities management services to electric utilities, independent and merchant power producers, government agencies, multinational and national oil companies, and industrial corporations worldwide. The Company's Power segment provides project-related services, including design, engineering, construction, procurement, technology, and consulting services primarily to the fossil and nuclear power generation industries. Its Plant Services segment offers

electric power refueling outage maintenance, turnaround and routine maintenance, modifications, capital construction, off-site modularization, fabrication, reliability engineering, plant engineering, plant support, and specialty services. The Company's Environmental and Infrastructure segment provides program and project management, management, design-build, engineering and construction, sustainability and energy efficiency, science and technology, facilities management, and emergency response and disaster recovery services for government and private sector clients. Its Energy and Chemicals segment offers consulting, technology licensing, project management, engineering, procurement, construction, commissioning, and startup services for the oil and gas, refining, petrochemical, and upstream industries. The Company's Fabrication and Manufacturing segment supplies fabricated piping systems for the electric power, chemical, and refinery industries. The Shaw Group also provides nuclear plant designs, licensing, engineering services, equipment, fuel, and various other products and services to the owners and operators of nuclear power plants.

8. Defendant James M. Bernhard Jr. ("Bernhard") is the Chairman, President, CEO and a founder of Shaw. He has served as the Chairman of the Board and the Company's CEO since August, 1990. Bernhard served as the President of the Company from August, 1990 to September, 2003 and from November, 2006 to present. Bernhard was a director during the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

9. Defendant Thomas E. Capps ("Capps") has served as the Company's Director since July, 2007. Capps is also a member of the Company's Audit Committee. Capps was a director during the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

4

10.     Defendant Michael J. Mancuso ("Mancuso") has served the Company's Director since August, 2006. Mancuso is also a member of the Company's Audit Committee. Mancuso was a director during the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

11.     Defendant Albert D. McAlister ("McAlister") has served as the Company's Director since April, 1990. McAlister is also a member of the Company's Compensation, Executive, and Nominating & Corporate Governance Committees. McAlister was a director during the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

12.     Defendant David Williams Hoyle Sr. ("Hoyle") has served as the Lead Director of the Company's Board since January, 1995. Hoyle is also a member of the Company's Executive, Audit, and Nominating & Corporate Governance Committees. Hoyle was a director during the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

13.     Defendant James F. Barker ("Barker") has served as the Company's Director since January, 2004. Barker was a director during the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

14.     Defendant Daniel A. Hoffler ("Hoffler") has served as the Company's Director since January, 2006. Hoffler is also a member of the Company's Compensation and Nominating & Corporate Governance Committees. Hoffler was a director during the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

15. Defendant Stephen R. Tritch ("Tritch") has served as the Company's Director since April, 2009. Tritch is also a member of the Company's Nominating & Corporate Governance Committee. Tritch was a director during the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC.

16. Defendant Crystal Acquisition Subsidiary Inc. is a Louisiana corporation and a wholly-owned subsidiary of CB&I formed for the purpose of completing the Proposed Transaction.

17. Defendant Chicago Bridge & Iron Company N.V. is a limited liability company with corporate seat in Amsterdam, the Netherlands, having its registered office at Oostduinlaan 75, 2596 JJ, Gravenhage, the Netherlands. CB&I engineers and designs, fabricates, erects, and repairs steel plate structures and their associated systems. The Company builds and repairs bulk liquid terminals, storage tanks, process vessels, and low temperature and cryogenic storage facilities.

18. The Defendants identified in paragraphs 9 through 16 are collectively referred to herein as the "Individual Defendants."

### BACKGROUND TO RELEASE OF THE
### FALSE AND MISLEADING REGISTRATION STATEMENT

19. On December 21, 2011, Shaw issued a press release wherein it announced its first quarter fiscal year 2012 financial results, which reported increased earnings in comparison to fiscal year 2011. Specifically, the press release reported increased profits (from $61.6 million in 2011 to $119.9 million) and EBITDA (from $11.9 million to $75.5 million).

20. The December 21, 2011 press release further stated in pertinent part:

Our consolidated results met our expectations for the quarter. We had a solid bookings quarter with new awards of $1.5 billion and a total backlog of $20.0

6

billion," said J.M. Bernhard Jr., chairman, president and chief executive officer of Shaw. "With significant new contract wins and renewals in the last two quarters, our Plant Services segment now serves 44 of the 104 operating nuclear power units in the country – more than any other maintenance provider. Our Environmental & Infrastructure and Fabrication & Manufacturing segments continue to perform well, and our Energy & Chemicals segment's project in Asia is nearing completion. Our Power segment is beginning to see a positive impact from the U.S. nuclear projects. We are expecting final approvals and licenses from the Nuclear Regulatory Commission in the coming weeks and expect the contributions from those projects to increase throughout fiscal year 2012.

21. On March 29, 2012, Shaw issued a press release announcing its second quarter fiscal year 2012 financial results, which stated that the Company, again, had been awarded new contracts, including contracts with Arizona Public Service Co. and U.S. Army Corps of Engineers.

22. On July 10, 2012, Shaw issued a press release wherein it announced its third quarter 2012 results, which reported increased revenues (from $1.5 billion in 2011 to $1.6 billion), profits (from $10.1 million in 2011 to $56.5 million), and EBITDA (from ($85.9) million to $14.9 million).

23. On July 30, 2012, the Company released the following announcement regarding the transaction:

> The Shaw Group Inc. (NYSE: SHAW) today announced it has signed a definitive merger agreement with CB&I (NYSE: CBI) under which CB&I will acquire Shaw in a cash and stock transaction valued at approximately $3 billion.
>
> Under the terms of the agreement, CB&I will acquire Shaw for $46.00 per share in cash and stock. Shaw's shareholders will receive $41.00 in cash and $5.00 in CB&I equity (0.12883 shares based on an agreed upon recent average stock price of $38.81 per share) for each share of Shaw stock at closing.
>
> The combination of CB&I and Shaw will create one of the world's largest engineering and construction companies focused on the global energy industry. Both companies believe this agreement will create value through a combined company with broader participation in a robust energy market.

"I am extremely proud of the company we have built and operated for the last 25 years. Shaw's leadership position in the power, environmental and infrastructure industries will complement CB&I's current business, and I am confident that, together, these two companies will continue to excel," said J.M. Bernhard Jr., chairman, president and chief executive officer of Shaw. "While Shaw has been growing in our business and has many opportunities ahead of us, we believe this transaction is in the best interest of and creates significant value for our shareholders, our employees and our customers."

CB&I plans to operate Shaw as a business sector under the brand name CB&I Shaw to enable the company to retain Shaw's brand equity and to allow the combined organization to capitalize on the resources, capacity and best practices from each group for the benefit of all stakeholders.

"This is a highly compelling transaction that will create significant value for our shareholders," said Philip K. Asherman, president and chief executive officer of CB&I. "Shaw is a great company with tremendously talented employees. By adding them into the CB&I family, we will become fully diversified across the entire energy sector. We will have the capacity and the expertise to provide our clients with the full range of solutions, wherever they are in the world. Most importantly, we will have the experience and relationships necessary to successfully meet and exceed our clients' expectations."

The transaction has been approved unanimously by the boards of directors of both companies. CB&I will finance the acquisition using cash on the balance sheets of both companies, along with debt financing pursuant to commitments from Bank of America and Credit Agricole. Closing of the transaction is subject to regulatory approvals, the approval of Shaw and CB&I shareholders and other conditions. The transaction currently is expected to close during the first calendar quarter of 2013.

24. Considering the Company's steady positive financial results and thriving performance, the terms of the Proposed Transaction are unfair to Shaw shareholders as the proposed price grossly undervalues the Company and constitutes unfair dealing, given the strong possibilities of growth and profitability of Shaw in light of its future prospects. The Proposed Transaction will deny shareholders the opportunity to benefit from the Company's valuable and profitable business and future growth in profits and earnings, *i.e.* other than a small continuing interest through the 11% equity portion of the consideration offered in the Proposed Transaction, whereby Shaw shareholders will only end up holding approximately 11% of the new combined company.

25. Furthermore, the 11% equity portion of the Proposed Transaction is at a fixed exchange ratio with no protective collar thereby leaving Shaw shareholders vulnerable to a drop in the value of CB&I stock prior to the deal close.

***Preclusive Deal Protection Devices***

26. As part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices, which, to the detriment of Shaw's shareholders, operate conjunctively to make the Proposed Transaction a *fait'accompli* and ensure that no competing offers will emerge for the Company.

27. The Individual Defendants ensured the failure of any post-Merger Agreement market check by agreeing to a "No Solicitation" provision in Section 5.3 of the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 5.3(a) of the Merger Agreement states that the Company shall:

> (i) immediately cease any ongoing solicitation, knowing encouragement, discussions or negotiations with any Persons that may be ongoing with respect to a Company Takeover Proposal, and promptly instruct (to the extent it has contractual authority to do so and has not already done so prior to the date of this Agreement or otherwise request, any Person that has executed a confidentiality or non-disclosure agreement within the 36-month period prior to the date of this Agreement in connection with any actual or potential Company Takeover Proposal to return or destroy all such information or documents or material incorporating confidential information in the possession of such Person or its Representatives and (ii) until the Effective Time or, if earlier, the termination of this Agreement in accordance with **Article VIII**, not, directly or indirectly, (A) solicit, initiate or knowingly facilitate or knowingly encourage (including by way of furnishing non-public information) any inquiries regarding, or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, a Company Takeover Proposal, (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other Person any non-public information in connection with or for the purpose of encouraging or facilitating, a Company Takeover Proposal (other than, solely in response to an unsolicited inquiry, to refer the inquiring Person to this **Section 5.3** and to limit its

conversation or other communication exclusively to such referral), or (C) approve, recommend or enter into, or propose to approve, recommend or enter into, any letter of intent or similar document, agreement, commitment, or agreement in principle (whether written or oral, binding or nonbinding) with respect to a Company Takeover Proposal.

28. Furthermore, the Defendants preclude Shaw's shareholders from achieving the maximum value of their shares because Section 5.03(b) of the Merger Agreement states that Shaw may only provide non-public information to third parties interested in purchasing Shaw if that third party has entered into an "Acceptable Confidentiality Agreement."

29. Furthermore, in accordance with Section 5.3(d) of the Merger Agreement, should the Board determine that the unsolicited offer is superior, CB&I is granted four business days to negotiate with Shaw and amend the terms of the Merger Agreement to make a counter-offer so that the competing bid no longer constitutes a superior proposal. CB&I is able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage that the Company has in receiving the unsolicited offer, and significantly deterring an alternative offer from coming forward.

30. In other words, the Merger Agreement gives CB&I access to any rival bidder's information and allows CB&I a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly ensures that any "auction" will favor CB&I and piggy-back upon the due diligence (and financial outlay) of the foreclosed second bidder.

31. In addition, Section 8.2 of the Merger Agreement provides that if the Company decides to pursue another offer, it must pay to CB&I a termination fee of $104 million, which constitutes 3.5% of the entire value of the Proposed Transaction. This term of the Merger

Agreement essentially requires that the alternate bidder agree to pay a naked premium for the right to provide Shaw shareholders with a superior offer.

32. Ultimately, these preclusive deal protection devices in the aggregate improperly restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited alternative acquisition proposal that constitutes, or would reasonably be expected to constitute, a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions will foreclose the new bidder from providing the needed market check of CB&I's inadequate offer.

## THE MATERIALLY MISLEADING AND INCOMPLETE REGISTRATION STATEMENT

33. The Individual Defendants are withholding material information about the Proposed Transaction from Shaw's public shareholders. The Registration Statement, pursuant to which the Board has recommended that Company shareholders vote in favor of the Proposed Transaction, contains numerous material omissions and misstatements in contravention of the Board's duty of candor. Specifically, the Registration Statement omits and/or misrepresents the material information set forth below in contravention of Sections 14(a) and 20(a) of the Exchange Act.

*Disclosures Related to the Events Leading up to The Announcement of the Proposed Transaction*

34. The Registration Statement fails to disclose material information concerning the events leading up to the announcement of the Proposed Transaction.

35. The Registration Statement fails to disclose whether and to what extent both Shaw's and CB&I's affiliation with Vogtle Electric Generating Plant located near Waynesboro in Burke County, Georgia affected their decision to enter into the Merger Agreement.

36. The Registration Statement at page 58 states that Company A and CB&I did not "reach agreement on certain contractual matters" that caused CB&I to proceed individually in the acquisition of Shaw, however, the Registration Statement fails to disclose what those "contractual matters" were or why were they so crucial in this joint acquisition effort.

37. The Registration Statement at page 15 states that "CB&I has not finalized any arrangements with current executive officers of Shaw with respect to their employment by the combined company," thereby implying that some of Shaw's employees or directors may continue with CB&I, however, the Registration Statement fails to disclose whether there are any such arrangements currently present, whether any of Shaw's executives or directors were promised employment with CB&I and on what terms.

38. The Registration Statement fails to disclose the negotiation process leading up to Mr. Bernard's, or any other senior executives', golden parachute compensation package.

39. The Registration Statement at page 61 states that "a second financial institution" was involved in the debt financing of the transaction, but fails to disclose the identity of the "second financial institution."

40. The Registration Statement fails to disclose if either Morgan Stanley or BofA Merrill Lynch would provide debt financing in connection with CB&I's acquisition of Shaw.

41. The Registration Statement fails to disclose whether and to what extent the sale of a 20% stake in nuclear power-plant company Westinghouse Electric Co. to Toshiba Corp. affected Shaw's financial statements.

### *Disclosures Related to the Financial Advisors' Analyses*
### *Morgan Stanley's Analysis*

42. The Registration Statement fails to disclose the following material information concerning Morgan Stanley's analysis:

(i) With respect to the *Public Market Trading Benchmarks Analysis*: a) individual multiples and ratios used for each of the publicly traded company included in the analysis; and b) specific basis and details regarding the selection of the range of multiples used for the illustrative range in estimating the implied value per share of Shaw's common stock.

(ii) With respect to the *Hypothetical Future Stock Price Analysis*: the description of the "street case," and specifically, the estimates used.

(iii) With respect to the *Discounted Cash Flow Analysis*: a) Shaw's unlevered, after-tax cash flows for the fiscal years 2012-2017; b) the basis for choosing a terminal exit multiple of NTM EBITDA ranging from 2.0x to 3.5x; and c) the management's projections from August 2011 and July 2012 used for the analysis.

(iv) With respect to the *Precedent Change of Control Premiums Analysis*: a) the list of the transactions used in the analysis; b) the type of transactions used, cash, stock-for-stock, or cash-and-stock; c) the basis for using premiums announced since 1990; and d) the transaction value and transaction date for each of the transactions used in the analysis.

### *BofA Merrill Lynch's Analysis*

43. The Registration Statement fails to provide the following material information concerning BofA Merrill Lynch's analysis:

(i) With respect to the *Selected Publicly Traded Companies Analysis*: a) details of the financial multiples and ratios used for each of the publicly traded companies listed in the analysis; and b) specific basis and details regarding the selection of the range of multiples used for the illustrative range of implied values.

(ii) With respect to the *Selected Precedent Transactions Analysis*: a) the type of transactions used, cash, stock-for-stock, or cash-and-stock; b) the transaction value and transaction date for each of the transactions used in the analysis; c) individual multiples and ratios used for each of the transactions included in the analysis; and d) specific basis and details regarding the selection of the range of multiples used in computing Shaw's implied per share equity value.

(iii) With respect to the *Discounted Cash Flow Analysis*: a) Shaw's unlevered, after-tax free cash flows for the calendar years 2013-2017; b) the basis for choosing perpetuity growth rates ranging from 1.0% to 2.0% in computing Shaw's terminal values; c) the process of determining the net cash of $935 million for Shaw.

(iv) CB&I's after-tax cash flows for the calendar years 2013-2017.

The above *information* is highly material as it is essential to allow shareholders to be able to make a fully informed decision concerning the Proposed Transaction.

44. The Individual Defendants were aware of their duty to disclose the foregoing material information in the Registration Statement and acted with at least negligence in failing to ensure that this material information was disclosed. Absent disclosure of this material information, shareholders are unable to make an informed decision whether to vote in favor of the Proposed Transaction, and are thus threatened with irreparable harm.

45. Accordingly, Plaintiff seeks' injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## COUNT I

### On Behalf of Plaintiff for Violations of Section 14(a) of the 1934 Act
### (Against the Company and the Individual Defendants)

46. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

47. Defendants have issued the Registration Statement with the intention of soliciting shareholder support for the Proposed Transaction.

48. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the 1934 Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

49. Specifically, the Registration Statement violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render it non-misleading.

50. The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## **COUNT II**

### On Behalf of Plaintiff for Violations of Section 20(a) of the 1934 Act
### (Against the Individual Defendants)

51. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52. The Individual Defendants acted as controlling persons of Shaw within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Shaw, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

53. Each of the Individual Defendants were provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

55. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving

16

the Proposed Transaction. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

56. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the 1934 Act.

57. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

58. Plaintiff has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor and against the defendants as follows:

A. Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until they comply with their duties under Sections 14(a) and 20(a) of the 1934 Act to provide shareholders with all material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets;

B. To the extent the Proposed Transaction is consummated prior to this Court's entry of a final judgment, rescinding it and setting it aside or awarding rescissory damages;

C. Directing Defendants to account to Plaintiff for all damages suffered by him as a result of defendants' wrongful conduct alleged herein;

D.  Awarding Plaintiff the costs, expenses, and disbursements of this action, including attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

E.  Awarding Plaintiff such other relief as this Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff hereby prays for trial by jury.

Dated: October 19, 2012

/s/ **ERIC J. O'BELL**
ERIC J. O'BELL (LA BAR #26693)
O'BELL LAW FIRM, LLC
3500 N. Hullen Street
Metairie, Louisiana 70002
Tel: (504) 456-8677
Fax: (504) 456-8624

**OF COUNSEL:**

**FARUQI & FARUQI**
JUAN E. MONTEVERDE
SHANE T. ROWLEY
369 Lexington Avenue, 10th Floor
New York, New York 10017
Tel: (212) 983-9330
Fax: (212) 983-9331